64 A.3d 903

**A & E NORTH, LLC**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE.**

No. 40, Sept. Term, 2012.

Court of Appeals of Maryland.

April 23, 2013.

254

David Snyder, (Herbert Bass of Fox Rothschild LLP, Philadelphia, PA; Randall M. Lutz and Jennifer A. DeRose of Saul Ewing, LLP, Baltimore, MD), on brief, for Petitioner/Cross–Respondent.

Andrew G. Bailey, Special Assistant Solicitor, (George A. Nilson, City Solicitor, and Sandra R. Gutman, Chief Solicitor of Baltimore City Department of Law, Baltimore, MD), on brief, for Respondent/Cross–Petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

ADKINS, J.

This case involves a neglected gem of Baltimore City—the Parkway Theater. Built in 1915 as a vaudeville venue, the once-popular theater has long been forgotten. For the last quarter of a century or so its sole purpose in life has been to store automobile parts and other assorted junk. In 2008 the City of Baltimore initiated a condemnation action to acquire the theater. That action was contested by the theater's owner, A & E North, LLC ("A & E"), which argued that the City had no right to condemn the property.

Six weeks before the condemnation trial, A & E filed an emergency motion, demanding a postponement and an order requiring the City to pay to move all the junk out of the theater prior to trial so that the jury would not view the property in its extant condition. A & E claimed it was entitled to this advance relocation payment under federal and Maryland relocation statutes because it was indigent. It

hoped the theater would show better without the junk, culminating in a higher "just compensation" award. The trial court denied A & E's motion, and the theater was shown to the jury as is, with "used auto parts and general rummage" piled up from the floor to the balconies. A & E now complains the court abused its discretion in denying the motion, resulting in a prejudicial view of the property. It asks for a new trial, but we refuse to grant that wish. Because A & E was not entitled to a relocation payment in advance of trial, it suffered no prejudice, beyond what it brought upon itself.

## STATEMENT OF FACTS AND LEGAL PROCEEDINGS

The subject property is located at 3 W. North Avenue in Baltimore, Maryland. Owned by A & E North, LLC, it is improved by the former "Parkway Theater" building. It has been a long time, however, since the building functioned as a theater. At all times relevant to this proceeding, it has been used to store a vast amount of personal property, consisting of "shelf-upon-shelf of used auto parts and general rummage," such as "boxes, carpets, furniture, appliances, used auto parts, and the like."

On October 9, 2008, the Mayor and City Council of Baltimore filed a Petition for Condemnation in the Circuit Court for Baltimore City, seeking to condemn the theater "for the public purpose of urban renewal, pursuant to the Charles/North Revitalization Area Urban Renewal Plan." A & E was served a copy of the petition on November 4, 2008.

A & E timely answered the City's petition and demanded a jury trial. It also filed a counterclaim, challenging the City's right to condemn the property.

In late December of 2008, the Circuit Court issued a scheduling order, setting the trial for August 1, 2009.

On July 6, 2009, A & E filed its first continuance request, alleging a "need for completion of expert report." The Circuit Court granted the request, rescheduling the trial to November 4, 2009. On October 23, 2009, the parties filed a joint motion for continuance, arguing that the "parties agree to partial

resolution; defendant has new counsel, and parties need time for additional discovery." The Circuit Court granted the second motion as well, and this time rescheduled the trial for February 24, 2010.

On January 15, 2010, six weeks before trial, A & E filed an Emergency Motion to Compel the Immediate Payment by the City of Relocation Expenses and a third continuance request. In that motion, A & E "request[ed] that the Court enter an Order compelling the City to immediately pay [its] relocation expenses, which would allow [A & E] to move its personal property from the Parkway Theater prior to trial." Additionally, A & E requested that the Court postpone the trial "for a period of ten weeks after [its] receipt of ... relocation expenses from the City."

In an accompanying memorandum, it argued that "Maryland and federal law expressly provide for the advance of payment of relocation expenses in instances of 'hardship.'" A & E emphasized that it is solely owned by Charles Dodson, who is "virtually penniless." Although he "wishes to relocate the Personal Property," he "does not have the funds to do so." A & E explained the amount of personal property stored at the Property is "so extensive that the City's own expert has estimated that it will cost approximately $290,000 to relocate it." In A & E's view, "the presence of the Personal Property obstructs the views of the magnificent interior and will cause the jury to discount its value, thereby severely prejudicing [its] case in the eyes of the jury." Thus, A & E argued the City should be ordered to pay for relocation prior to trial. On February 17, 2010, unpersuaded by these arguments, the Circuit Court denied both A & E's motion for payment and its request for postponement of trial.

One day before the scheduled trial date, on February 23, 2010, A & E withdrew its challenge to the City's right to acquire the Property. At the beginning of the trial, A & E asked for a continuance again, citing its lack of appraisals, Mr. Dodson's health, and the continued presence of junk in the theater, but the court was not moved by these arguments and

denied the motion. Believing that, without a continuance, the trial would proceed "with a prejudicial jury view of the property and without any of [its] three experts," A & E decided not to "participate in this trial other than to object at necessary times."

For that reason, A & E did not make an opening statement, did not cross-examine the City's witness, did not present its own evidence, or make a closing argument. As a result, the evidence before the jury consisted of the testimony of the City's appraiser, several documents and photographs prepared by him, and the jury's view of the property. At the end of the second day of trial, the jury returned a verdict in the amount of $340,000, the amount the City argued was the property's fair market value. Based on that judgment, the Circuit Court entered an inquisition.[1]

After denial of its Motion for a New Trial, A & E timely appealed to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals held that the Circuit Court did not abuse its discretion in denying A & E's request for an advance relocation payment prior to trial or a continuance. We granted both A & E's petition for a writ of certiorari and the City's cross-petition. *See A & E North, LLC v. Mayor of Balt.*, 427 Md. 605, 50 A.3d 605 (2012). We agreed to consider the following two questions presented by A & E:

(1) Did the Circuit Court abuse its discretion in denying A & E's motion for an advance relocation payment prior to trial?

(2) Did this denial result in a prejudicial jury view of the Property? [2]

The City asks the following questions:

---

**1.** The term "inquisition" refers to the verdict "signed by each member of the jury or, if the action is tried without a jury, by the judge hearing the [condemnation] action." Md. Rule 12–208(a).

**2.** We paraphrase A & E's questions for clarity and brevity. A & E stated the following three questions in its Petition for Certiorari:

(1) Does a property owner have a right to a relocation payment before resolution of a challenge to a condemning authority's right to acquire the subject property?

(2) Is a property owner required to pursue and exhaust the statutory administrative process pertaining to issuance of a relocation payment?

## DISCUSSION

Relying on a statute that provides for payment of relocation expenses in advance of **a move,** A & E argues it is entitled to an advance relocation payment prior to **trial** because A & E's owner is indigent. This argument has a wrong focus and fails to address necessary issues. First, it ties the claim of entitlement to an advance payment to the trial, as opposed to the move. It also overlooks the circumstances of this case, namely that at the time A & E requested an advance payment, it was contesting the City's right to condemn the theater. Furthermore, although the argument focuses on A & E's alleged hardship, as in any other relocation assistance case, the primary consideration is whether A & E was a "displaced person" at the time it requested assistance. Thus, we reframe the issue presented by the circumstances of this case: may a condemnee [3] be entitled to a payment of relocation expenses in advance of the trial, when the condemnee challenges the

---

1. Should this Court grant certiorari where no Maryland courts have determined when a condemnee is entitled to advance payment of relocation benefits due to a hardship and whether a prejudicial jury view of the condemned property entitles a condemnee to a new trial?

2. Is the Court of Special Appeals [sic] new standard to determine whether a condemnee is a displaced person under the Relocation and Assistant Act contrary to the plain language and legislative intent of the act?

3. Whether the Court of Special Appeals erred in confusing the concepts of hardship and prejudice, and as a result, misconstrued this Court's holding in *Bern–Shaw v. Baltimore?*

**3.** We use the term "condemnee" loosely to include anyone affected by a condemnation action, including, but not limited to "displaced persons" discussed below.

condemning agency's authority to condemn? We answer this question in the negative.[4]

## Condemnation Proceedings Generally

█ Before we delve into the particulars of relocation expense payments, some general background on condemnation proceedings is useful. A condemnation action is the State's exercise of the power of eminent domain. *Mayor of Balt. City v. Valsamaki,* 397 Md. 222, 241, 916 A.2d 324, 335 (2007). Simply defined, "eminent domain" is the "inherent power of a governmental entity to take privately owned property . . . and convert it to public use. . . ." *Black's Law Dictionary* 601 (Bryan A. Garner et al. eds., 9th ed.2009).

█ This power, however, must have a source, *i.e.* the condemning agency must have the general power to condemn. Although the State of Maryland "has inherent powers of condemnation, political subdivisions of the State have no condemnation powers other than those directly, or by necessary implication, conferred upon them by the State Legislature." George W. Baker, Jr. & Philip Z. Altfeld, *Maryland's New Condemnation Code,* 23 Md. L.Rev. 309, 311 (1963). Even then, the power to condemn is not absolute. In accordance with Article III, § 40 of the Maryland Constitution and the Fifth and Fourteenth Amendments to the United States Constitution, government entities may only take private property for "public use" and with a payment of "just compensation" to the affected property owner. *J.L. Matthews, Inc. v. Md.–Nat'l Capital Park & Planning Comm'n,* 368 Md. 71, 87, 792 A.2d 288, 297 (2002) (citation and quotation marks omitted). Additionally, there must be some necessity for the taking. *Green v. High Ridge Ass'n,* 346 Md. 65, 72, 695 A.2d 125, 128 (1997).

---

4. The holding that A & E was not entitled to an advance relocation payment prior to trial also resolves the second issue presented, namely that no prejudice resulted from the City's refusal to pay the relocation expenses prior to trial. This holding also makes it unnecessary for us to reach the issues raised by the City in its cross-petition.

While the General Assembly's grant of authority to condemn creates authority to condemn property in general, the presence of "public use" and "necessity" establish a condemning agency's right to condemn a particular property. The latter two issues are always decided by the courts, *Utilities, Inc. v. Wash. Suburban Sanitary Comm'n,* 362 Md. 37, 48, 763 A.2d 129, 135 (2000), although under different standards: "the question whether or not the purpose of a taking is a public one is judicial, [but] the necessity or expedience of the taking is a legislative question." *Riden v. Phila., Balt. & Wash. R.R. Co.,* 182 Md. 336, 345, 35 A.2d 99, 103 (1943) (citing *Sears v. City of Akron,* 246 U.S. 242, 251, 38 S.Ct. 245, 248, 62 L.Ed. 688 (1918)). Determining the amount of "just compensation," however, is the jury's responsibility, *Utilities, Inc.,* 362 Md. at 48, 763 A.2d at 135, "unless all parties file a written election submitting the case to the court for determination," Md. Rule 12–207(a).

Procedurally, condemnation proceedings are governed by Maryland Rules 12–201 through 12–213. These rules cover such issues as, for example, venue, discovery, and the view of the property to be condemned. *See* Md. Rules 12–202, 206, 207(c). Rule 12–209 spells out the two possible outcomes of a condemnation trial. It provides that "[i]f the court decides that the plaintiff is entitled to condemn, the court, upon the return of the inquisition, shall enter judgment ... for the amount ... awarded." Md. Rule 12–209(a). If, however, "the court decides that the plaintiff is not entitled to condemn, the court shall enter judgment against the plaintiff ... for costs...." Md. Rule 12–209(b). A determination of whether the condemning authority has the right to condemn a particular property, however, need not wait until the trial and could be made "by the court as a preliminary matter." *Potomac Elec. Power Co. v. Birkett,* 217 Md. 476, 482, 143 A.2d 485, 489 (1958).

When it comes to awarding compensation, an award is considered "just" if it reflects the "fair market value" of the property. *J.L. Matthews,* 368 Md. at 88, 792 A.2d at 298.

Here, the jury may consider a number of factors, "including, improvements on the land, the sales of comparable lands, evidence of reasonable probability of rezoning, and any special features which may enhance the property's marketability." *Id.* at 89, 792 A.2d at 298 (alterations, citations, and quotation marks omitted).

## Relocation Assistance

The "just compensation" for the taking of property is not the only type of compensation to which a condemnee may be entitled. Both federal and Maryland statutes provide for relocation assistance to persons affected by condemnation. In Maryland, an express statutory grant of compensation for the moving costs was enacted for the first time in 1959. Chapter 688 of the Acts of 1959 (codified at Md.Code (1957, 1959 Cum.Supp.), Article 33A, § 21B). That grant was extended in 1961 and further expanded in 1963, when the General Assembly revamped Maryland's condemnation law. Chapter 286 of the Acts of 1961 (codified at Md.Code (1957, 1961 Cum.Supp.), Article 33A, § 21B); Chapter 52 of the Acts of 1963 (codified at Md.Code (1957, 1963 Cum.Supp.), Article 33A, § 12).

More significant changes in Maryland's relocation assistance law came in 1971. These changes were triggered by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub.L. No. 91–646, 84 Stat. 1894 (codified as amended at 42 U.S.C. §§ 4601–4655 (2002 & Cum.Supp. 2012)) ("URRA"), enacted by Congress. URRA's stated purpose was adopting a uniform policy for a fair and equitable treatment of persons displaced as a result of federal and federally assisted projects. It "require[d] that in order to obtain maximum Federal funds, for the Federally-aided public projects, the State relocation assistance legislation must conform to the [federal] requirements of said Public Law 91–646." *See* Chapter 628 of the Acts of 1971.

To ensure eligibility for maximum federal funds, the General Assembly enacted a new subtitle, titled Relocation Assistance Policies and Payments, initially codified in Md.Code

(1957, 1971 Repl.Vol., 1971 Cum.Supp.), Article 33A, § 6A–H ("Relocation Expenses Act"). This subtitle is the Maryland counterpart of Subchapter II of the Federal Act, which likewise deals with relocation assistance.[5] *See* Md.Code (1974, 2010 Repl.Vol.), §§ 12–201–12–1212 of the Real Property Article ("RP").

Both the General Assembly and the U.S. Congress made clear the legislative intent behind the relocation statutes. In enacting the Relocation Expenses Act, the General Assembly expressly stated that the purpose of the Act was to ensure that persons affected by condemnation efforts of a displacing agency do "not suffer disproportionate injuries as a result of programs designated for the benefit of the public as a whole," and "to establish a uniform policy for the fair and equitable treatment of [such] persons." Chapter 628 of the Acts of 1971. The stated purpose of the URRA likewise provides: "The primary purpose of this title is to ensure that such persons shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons." 42 U.S.C. § 4621.

Even more illustrative of the legislative intent is Congress's explanation that relocation assistance was necessary because compensation for the property alone was not enough:

---

**5.** A & E argues it is entitled to an advance relocation expenses payment both under federal and Maryland law but does not explain why the federal law applies here. The closest A & E comes to substantiating its federal law claims is when it alleges that "[t]he City has admitted that A & E is entitled to relocation payments under both Maryland statutes and the federal relocation statutes...." Here, A & E refers to a statement made by Diversified Property Services, Inc. in a brochure on relocation assistance services. Diversified Services, Inc. was commissioned by the City to facilitate the relocation of businesses affected by the Charles/North Urban Revitalization renewal project, but the statement in the brochure hardly justifies A & E's argument for entitlement for benefits under the federal law. As does the City and did the Court of Special Appeals, we will focus on the Maryland law. We note, however, that the language of Maryland Title 12 and Subchapter II of the Federal Act is very similar.

In a less complex time, Federal and federally assisted public works projects seldom involved major displacements of people.... As the thrust of Federal and federally assisted programs [has] shifted from rural to urban situations, it became increasingly apparent that the application of traditional concepts of valuation and eminent domain resulted in inequitable treatment for large numbers of people displaced by public action....

\*      \*      \*

... [This legislation] recognizes that relocation is a serious and growing problem in the United States and that the pace of displacement will accelerate in the years immediately ahead....

H.R.Rep. No. 91–1656 (1970), *reprinted in* 1970 U.S.C.C.A.N 5850, 5850–52.

Carrying out this legislative intent, in Maryland, persons who move themselves or move personal property "[a]s a direct result of a written notice of intent to acquire or the acquisition of ... real property in whole or in part by a displacing agency," are considered "displaced persons" and may be entitled to a payment of their relocation expenses.[6]   RP §§ 12–201(e)(1), 205, 210(c)(2).

Real Property Article, Title 12, Subtitle II discusses various types of relocation assistance available in Maryland.   The provisions relevant in this case are Sections 12–205 and 12–210.   Section 12–205 covers reimbursement for actual moving and relocation expenses to displaced persons and provides in pertinent part that

(a) ... Whenever a program or project undertaken by a displacing agency will result in the displacement of any

---

**6.**  Namely, RP § 12–201(e)(1) defines a "displaced person" as

(i) Any person who moves from real property, or moves his personal property from real property:

1.  As a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency....

person, the displacing agency shall make a payment to the displaced person ... for:

(1) Actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property. ...

Section 12–210(c)(2) accommodates hardship cases, requiring a displacing agency to pay relocation expenses in advance of the move when "a displaced person ... makes proper application for a payment [otherwise] authorized for the person by this subtitle." [7]

At oral argument, the City explained how these provisions work in practice. Some property owners request assistance with the relocation itself, in which case the City hires a moving company to facilitate the move and pays the moving company directly. Alternatively, a property owner may elect to do a self-move. In that instance, the owner ordinarily pays for the relocation "out of their own pocket" and submits receipts to the City for reimbursement. If an owner "can't reach into their own pocket" to pay for the relocation, Section 12–210(c)(2) comes into play and the owner may seek a payment for relocation expenses in advance of the move. Typically, this is done in installments—the City would issue payments to the owner in increments in proportion to the amount of the personal property moved.

### The Condemnation of the Parkway Theater

▇ A & E elected to move the personal property from the theater itself but claimed hardship and sought an advance relocation payment from the City. Importantly, A & E did not just insist that the City make the payment in advance of the

---

7. This provision provides more fully:

> (c) ... Each displacing agency may establish rules and regulations and procedures as it may determine to be necessary to assure:
>
> \*      \*      \*
>
> (2) That a displaced person who makes proper application for a payment, authorized for the person by this subtitle, is paid promptly after a move or, in hardship cases, is paid in advance. ...

RP § 12–210(c)(2).

move; rather it demanded that it make the payment prior to trial. Without a doubt, A & E's request came before the move as RP § 12–210(c) contemplates, but at a time when A & E was still challenging the City's right to condemn the property. Although there may be instances when a displaced person is entitled to a relocation payment prior to a move, a person challenging the condemning agency's right to condemn is simply not a "displaced person" entitled to such relief.

*Payment in Advance of the Move, not in Advance of Trial*

The statute at the center of A & E's claim provides in pertinent part "[t]hat a displaced person who makes proper application for a payment . . . is paid promptly after a move or, in hardship cases, is paid in advance." RP § 12–210(c)(2). By the express terms of the statute, the focal point of this provision is the move, not the trial. This is consistent with the legislative intent behind the relocation statutes, which is to ensure that condemnees do not suffer "disproportionate injuries" during relocation necessitated by projects designed to benefit the general public. *See* Chapter 628 of the Acts of 1971; 42 U.S.C. § 4621. Assisting with relocation expenses prior to the move helps further that goal.

But the reason A & E requested an advance payment was not to facilitate its move. Rather, it demanded payment to maximize the amount of its "just compensation" award. A & E does not pretend otherwise. This is how A & E explained the urgency of its payment request in the combined Motion for Emergency Advance Relocation Payment and Postponement of Trial:

> [I]t is critical that the jury have an opportunity to view the interior of the Parkway Theater uncluttered by the Personal Property. . . . The photographs clearly show that the presence of the Personal Property obstructs the views of the magnificent interior and will cause the jury to discount its value, thereby severely prejudicing [A & E's] case in the eyes of the jury.

A & E's communications with the City's counsel likewise highlight A & E's desire to obtain an advance relocation payment prior to the trial, not just prior to the move. For instance, as part of negotiations between A & E and the City, in an October 7, 2009 email, A & E requested that "[t]he relocation damages payment shall be paid in enough time to permit [A & E] to relocate its property **prior to any trial.**" (Emphasis added). A draft agreement, prepared by A & E and sent to the City, dated October 15, 2009, likewise provided that "[t]he Personal Property must be relocated **prior to trial.**" (Emphasis added).

The City argues that A & E's attempt to blur the "distinction between a payment in *advance of a move* . . . and a payment sought in *advance of trial*" is improper. It challenges A & E's right to utilize the Relocation Expense Act as litigation strategy, concluding that "even where a 'displaced person' could be entitled to a relocation payment in advance of a move, no authority mandates payment of relocation benefits in advance of trial."

We agree with the City. The purpose of the relocation statutes is to assist with relocation by providing for (1) reimbursement of actual relocation and moving expenses and (2) payment of relocation expenses in advance of the move in hardship cases. While the purpose of a payment in advance of a move is to facilitate the move, a payment in advance of trial is "to enhance the Property's visual appeal to a jury." The latter is not a goal contemplated by the Act.[8]

To illustrate the error in A & E's approach to receiving relocation benefits prior to trial, the City, at oral argument, offered a preamble to "a hypothetical piece of legislation."

---

8. We also point out the obvious: A & E itself created the condition that it now considers unfavorable. Unlike in *Bern–Shaw Ltd. Partnership v. Mayor of Baltimore,* 377 Md. 277, 285, 833 A.2d 502, 506 (2003), in which the property substantially deteriorated through no fault of the owner but was attributable to the inaction by the displacing agency, A & E is the party solely responsible for the accumulation of auto parts and junk. To be sure, A & E was free to use its property whichever way it preferred, but it also must bear the consequences of its own actions.

The preamble read as follows: "An act to provide relocation benefits to a condemnee in advance of a determination of the condemning authority's right to take the property to be used to enhance the aesthetics of the property sought to be condemned." This hypothetical rather accurately demonstrates the fallacy of A & E's theory. Enhancing a property's value is certainly not a result the relocation assistance statutes seek to accomplish.

A & E fears that our holding that it was not entitled to an advance payment prior to trial "could result in condemnees, and others entitled to relocation benefits, to be denied the benefits. . . ." We do not share A & E's concerns. True, our holding deprives A & E of obtaining "a tactical advantage at trial to maximize the amount of a jury's 'just compensation' award." But A & E could have (if it had not been contesting the City's right to condemn), and still can now, after the trial, apply for the payment of relocation expenses in advance of the move. *See* RP § 12–201(e)(1), 205, 210(c)(2). It just cannot demand that such a payment be made before trial, especially not when it is contesting the City's authority to condemn.

These reasons alone justify an affirmance of the Court of Special Appeals' decision affirming the trial court's denial of A & E's Emergency Motion. But because A & E's request for payment came not only before trial but also before the move, we go on to consider A & E's claim of entitlement to payment in advance of the move, independently of the trial.

### Not a "Displaced Person" While Challenging Right to Condemn

The City's main argument is that A & E was not entitled to an advance payment because it was not a displaced person at the time it filed the Emergency Motion. It emphasizes that, under Maryland law, only "displaced persons" are entitled to relocation assistance, and in order to be considered a "displaced person," one must move as a "direct result" of either (1) receiving "a written notice of [the displacing agency's] intent to acquire" or (2) the displacing agency's "acquisition of [the] real property" at issue. RP § 12–201(e)(1)(i). But, the

City argues, A & E fails to meet either of the two prongs. With regard to the second prong, A & E certainly did not move its personal property as a "direct result" of the property's acquisition since there was no acquisition at the time A & E filed the motion for relocation expenses.

With regard to the first prong, the City adopts the reasoning of the Court of Special Appeals, which found two reasons why A & E did not move as a direct result of the City's written notice of intent to acquire. First, the intermediate appellate court held, and the City argues before us, there was no requisite causal connection because A & E did not file the Emergency Motion for an Advance Payment until fourteen months after it was put on notice of the City's intent to acquire the property. Second, the reason A & E requested the advance payment was not to receive assistance with the move but rather to gain a tactical advantage at trial.

In response, A & E does not dispel the City's arguments that it is not a displaced person. Rather, it tries to avoid discussing the issue altogether by focusing instead on its alleged hardship and other language in the statutes. For instance, it broadly states that "Maryland and federal law require the advance payment of relocation expenses where the condemnee suffers hardship, such as being indigent." It also highlights the following language in RP § 12–205(a): "Whenever a program or project undertaken by a displacing agency **will result in the displacement of any person,** the displacing agency **shall** make payment to the displaced person. . . ." Finally, A & E mischaracterizes the City's position by suggesting that the reason why the City does not consider it to be a "displaced person" is simply because it had not moved prior to requesting relocation assistance.

We are not convinced by A & E's arguments. A & E's alleged hardship does not resolve the primary eligibility question in this case. The City is correct to emphasize that being a "displaced person" is a prerequisite in any relocation assistance case. Section 12–210(c), on which A & E bases its alleged eligibility for advance payment, states so expressly by

spelling out that even in hardship cases only "a **displaced person** ... is paid in advance" of the move. (Emphasis added). Thus, even if this was a hardship case, A & E had to first and foremost establish that it was a displaced person.

Furthermore, contrary to A & E's contention, the City did not argue "that a prior move is ... a prerequisite to the advance payment of relocation expenses in hardship cases."[9] What the City did argue was that, "[a]s of the date the Circuit Court denied the Emergency Motion, A & E North disputed the City's right to acquire the property, and, therefore, the City's authority to displace it." As a result, at the time, it was not even known "whether A & E North would become displaced due to acquisition." Under those circumstances, ordering the City to pay relocation costs in advance of determination that the City had authority to condemn "would have jeopardized public funds." Further complicating matters, the City points out, was the uncertainty of "which party would be required to fund the property owner's return to the property," if A & E was successful in establishing that the City had no right to condemn the property.

We agree with the City's conclusion: at the time A & E filed the Emergency Motion, it was not a "displaced person." In so holding, however, unlike the City and the Court of Special Appeals, we do not place the emphasis on the fourteen-month lapse of time between the City's initiation of the condemnation proceedings and A & E's Emergency Motion for Advance Payment. Rather, we find more convincing the City's alternative argument that A & E "had no right to a relocation payment while it was challenging the City's right to acquire the property."

---

9. Indeed, such an argument would have been wrong. As another court has aptly explained: "Actual exercise of the power of eminent domain is not prerequisite to eligibility for relocation benefits. The crucial issue in determining eligibility for benefits is whether there is a 'causal connection between the acquisition [by the public entity] and the displacement which brings into play the provisions' of [the relocation statutes]." *Peter Kiewit Sons' Co. v. Richmond Redevelopment Agency*, 178 Cal.App.3d 435, 223 Cal.Rptr. 728, 733 (1986) (alterations in both) (citations omitted).

As the City properly emphasizes, in order to be a displaced person, one must move from real property "[a]s a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part by a displacing agency." RP § 12–201(e)(1)(i). The problem with A & E's claim for an advance payment is that at the time A & E filed the motion, it argued that the City had "no right to condemn" and that A & E should not and would not be displaced after all. A & E did not withdraw its challenge to the City's authority to condemn until five days after the Circuit Court denied its Emergency Motion for an Advance Payment and Continuance, which was one day before the scheduled trial date.[10] Thus, even if it was unlikely that the Circuit Court would have held that the City had no right to condemn A & E's property, at the time A & E filed the motion, there was still a possibility that the court would have agreed with A & E and found that either the "public use" or the "necessity" prong of the right-to-condemn test was not met.[11] *See, e.g., Prince George's Cnty. v. Beard,*

---

**10.** Notably, A & E renewed its motion to continue at the start of the trial but did not renew its Emergency Motion for Advance Payment. A & E is not appealing the Circuit Court's denial of that motion to continue, but we agree with the Court of Special Appeals that denying that motion was within the court's discretion. *See Neustadter v. Holy Cross Hosp. of Silver Spring, Inc.,* 418 Md. 231, 241, 13 A.3d 1227, 1233 (2011). As we previously explained, the motion to continue made at the start of the trial was the fifth motion to continue filed. In light of the two continuances previously granted, the Circuit Court acted within its discretion when, at the beginning of trial, it concluded that "[t]here appears to have been more than ample time" and denied the motion.

**11.** When A & E filed its answer, challenging the City's right to condemn, it provided no specific allegations of why the City lacked the right to condemn the theater. Rather, it generally stated that "the City does not have legal authority to acquire the property" because it has no "legally adopted development plan in accordance [with] the requirements of Article 13, Section 2–6 of the Baltimore City Code, Article III, Section 40 of the Maryland Constitution, and the Fifth and Fourteenth Amendments of the United States Constitution." To the contrary, the City's petition to condemn A & E's property stated that the City was "duly authorized to acquire the property interest [in A & E's property] for public purposes by the following Ordinances of the Mayor and City Council of Baltimore: (1) Article 13, § 2–7(b) and (h) of the Baltimore City Code; and (2) Ordinance No. 799, approved on October 25, 1982, and as subsequently amended." Further, the City alleged in the peti-

266 Md. 83, 96, 291 A.2d 636, 643 (1972) (refusing "to hold on such a record that a public use has been established" to avoid creating the impression "that a public body may condemn private property for any purpose which suits its convenience . . . without restraint").

At the time A & E filed the Emergency Motion and during the negotiations leading up to it, A & E held on to its challenge to the City's power to condemn to pressure the City into paying the relocation expenses in advance of trial. Specifically, A & E promised to withdraw its challenge of the City's right to condemn only if, "among other things: (i) the City paid A & E relocation damages; (ii) the relocation payment would be made prior to A & E's relocation; and (iii) the relocation damages would be paid in time for A & E to relocate its Personal Property prior to trial."

A & E cannot have it both ways: it cannot simultaneously maintain, on the one hand, that it is a "displaced person" because the City is going to condemn its property and, on the other hand, argue that the City should not be able to condemn the property because it has no legal right to do so. Requiring the City to make an advance relocation payment under those circumstances would lead to an absurd result indeed: the City would be paying the cost of relocating personal property of a person who may never become displaced. It is not at all clear what would happen with the relocation payment or which party would be responsible for returning the owner's personalty to the property, if the court were to find that the City had no power to condemn. The City correctly points out that "Title 12, Section 2 of the Real Property Article does not address those issues." The City's fear that it "would have no remedy to recover the payment," if "a court subsequently determined that the condemnor lacked the right to acquire the subject property" is not unfounded.

---

tion that it was "necessary" for it to acquire A & E's property and that the "property will be used for redevelopment purposes in the Charles North Project Area."

These arguments further support our conclusion that a condemnee may only be entitled to a relocation payment in advance of the move if there is no uncertainty about the condemning agency's right to condemn the particular property, *i.e.* that the condemnee truly is a "displaced person." A condemnee cannot be such a "displaced person" if it contests the condemning agency's right to condemn the property.

## Conclusion

The relocation statutes provide for an advance relocation payment in cases of hardship to displaced persons. They do not provide for a relocation payment in advance of trial. Nor do they provide for relocation assistance to persons who have not been displaced. Even if, as A & E claims, this was a case of hardship, A & E was not a "displaced person" at the time it requested an advance relocation payment. Furthermore, although A & E may have been (and still may be) entitled to a payment in advance of the move, it was not entitled to payment in advance of trial, especially not when it was contesting the City's authority to condemn. The Circuit Court did not abuse its discretion in denying A & E's emergency motion.

Because A & E was not entitled to payment in advance of the trial, it could not have been prejudiced by the City's refusal to pay relocation expenses in advance of the trial, and it is not entitled to a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.**